# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| TULSA FIRE FIGHTERS ASSOCIATION, | ) | |
| IAFF LOCAL 176, AFL-CIO, DENNIS | ) | |
| MOSEBY, CHAD MILLER, JEFF | ) | |
| SMITH, and JOSEPH YOUNGBLOOD, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 11-cv-432-GKF-FHM |
| | ) | |
| CITY OF TULSA, OKLAHOMA, and | ) | |
| THE HONORABLE DEWEY F. | ) | |
| BARTLETT, JR., MAYOR OF THE | ) | |
| CITY OF TULSA, | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED OPINION & ORDER[1]

On July 28, 2011, Plaintiffs' Motion for a Preliminary Injunction came on for hearing. Upon review of the facts and the applicable law, the court concludes the motion must be denied, and enters the following findings and conclusions in support of its decision as required by Fed.R.Civ.P. 52(a)(2).

## I. FINDINGS OF FACT

1. Plaintiff Tulsa Fire Fighters Association, IAFF [International Association of Fire Fighters] Local 176, AFL-CIO ("IAFF Local 176") is the collective bargaining representative for fire fighters in the City of Tulsa, Oklahoma under Oklahoma's Fire and Police Arbitration Act, Okla. Stat. tit. 11, §§ 51-101 *et seq.* [Complaint, Doc. No. 2-1, ¶

---

[1] The Opinion & Order entered August 10, 2011 is hereby amended *sua sponte* to more accurately reflect the law set forth in Paragraph 33 of the Conclusions of Law.

1, as admitted].  Six hundred sixteen (616) of the six hundred eighteen (618) members of the Tulsa Fire Department are members of IAFF Local 176.  The Chief and the Administrative Chief of the Tulsa Fire Department are members of IAFF Local 176.

2.  Plaintiff Dennis Moseby is a resident of Osage County, Oklahoma and is a retired fire fighter for the City of Tulsa.  He is the elected President of IAFF Local 176. [Complaint, ¶ 2, as admitted].

3.  Plaintiff Jeremy Chad Miller is a resident of Tulsa County, Oklahoma and is a Captain on the Tulsa Fire Department.  He is the elected Secretary-Treasurer of IAFF Local 176.  [Complaint, ¶ 3, as admitted].

4.  Plaintiff Jeff Smith is a resident of the City of Tulsa and is an active fire fighter for the City of Tulsa.  He is an elected Vice President of IAFF Local 176.  [Complaint, ¶ 4, as admitted].

5.  Plaintiff Joseph Youngblood is a resident of Tulsa County, Oklahoma and is an active fire fighter for the City of Tulsa.  He is an elected Vice President of IAFF Local 176.  [Complaint, ¶ 5, as admitted].

6.  Defendant City of Tulsa, Oklahoma is a municipal corporation organized under the laws of the state of Oklahoma.  [Complaint, ¶ 6, as admitted].

7.  Defendant The Honorable Dewey F. Bartlett, Jr., is named in this suit in his official capacity as Mayor of the City of Tulsa, Oklahoma.  [Complaint, ¶ 7, as admitted].

**A Chronological History of the Relevant Legal Facts**

8.  The City of Tulsa is a "charter municipality" or "home rule city" under Oklahoma law.  The City adopted its first charter at a special election held July 3, 1908.  The 1908 Charter of the City of Tulsa prohibited fire fighters from taking part in political

campaigns:

### SECTION 5.  SHALL NOT TAKE PART IN POLITICAL CAMPAIGNS.

No chief, officer or member of the Tulsa Fire Department shall take part in any political campaign, and no member, officer or chief shall use his official position to further the interest of any political candidate, faction or party; no chief, officer or member shall contribute any service, money, or thing of value to any political party, or person; violation of this section shall be sufficient cause for dismissal from the department.

1908 Charter, Article 13, Section 5, Doc. 16-1, Exhibit 3.  The 1908 Charter did not single out fire fighters, as it also prohibited classified employees of the City from engaging in political activities.

9.  In 1981, the Oklahoma legislature adopted Okla. Stat. tit. 11, § 22-101.1, which provided, in pertinent part:

Any municipal employee may actively participate in partisan and non-partisan political activities.  Provided, the political activity in which the employee participates shall only be exercised during off-duty hours and while not in uniform.  Provided further, any federal statutes or municipal charters for cities having a population in excess of one hundred thousand (100,000) persons according to the preceding Federal Decennial Census restricting the political activities of certain municipal employees shall, as to such employees, supersede the provisions of this section.

10.  On October 21, 1981, Oklahoma Attorney General Jan Eric Cartwright issued Opinion No. 81-90, in which he concluded "that city charter provisions which prohibit municipal officers and employees from engaging in plainly identifiable acts of partisan political campaigning are valid and constitutional.  However, such provisions are superseded by 11 O.S. 1981, §22-101.1, et seq."  1981 OK AG 90.

11.  Two years later, in 1983, the Oklahoma legislature amended Okla. Stat. tit. 11, § 22-101.1.  Portions were deleted, and the underlined portions were added:

Any municipal employee may actively participate in partisan and nonpartisan political activities. Provided, the political activity in which the employee participates shall ~~only~~ be exercised <u>only</u> during off-duty hours and while not in uniform. ~~Provided further, any~~ <u>Any</u> federal statutes ~~or municipal charters for cities having a population in excess of one hundred thousand (100,000) persons according to the preceding Federal Decennial Census~~ restricting the political activities of certain municipal employees shall~~,~~ <u>supersede the provisions of this section</u> as to such employees~~, supersede the provisions of this section~~.

12. In 1984, then-City Attorney Neal McNeill issued Opinion No. 84-4 in response to a request from the City Personnel Department asking whether Okla. Stat. tit. 11, § 22-101.1 is applicable to classified employees and fire fighters of the City of Tulsa. [Defendants' Exhibit 2]. The City Attorney answered in the negative, reasoning that the charter of a home rule city controls over conflicting state law in matters of purely local interest.

13. The City of Tulsa amended its charter at a special election held February 14, 1989. The 1989 Amended Charter is less restrictive than the 1908 Charter in its prohibition of political activities by classified employees and by officers and members of the Tulsa Fire Department. The 1908 Charter prohibited classified employees and firefighters from taking part in *any* political campaign. In contrast, the 1989 Amended Charter prohibits participation only in elections for the election of city officers:

> **SECTION 5.1. POLITICAL ACTIVITIES PROHIBITED.** No chief, officer, or sworn member of the Fire Department shall take an active part in any campaign for the election of officers of the city, except to vote and privately state a personal opinion.

1989 Amended Charter, Article XI, § 5.1; Doc. 16-1, Exhibit 1. *See also* Article X, § 10.1 (prohibiting political activities by persons in the classified service).

14. In 1990 and 1991, City Attorney McNeill issued three formal legal opinions concerning political activities by city employees, including firefighters. [Defendants'

Exhibits 4, 6 & 7]. Each of the opinions affirmed the validity of City Charter provisions forbidding municipal employees, including fire fighters, from playing an "active part" in campaigns for the election of city officers. The formal legal opinions addressed the effect of Okla. Stat. tit. 11, § 22-101.1, and concluded that Tulsa's charter provisions relate to local, municipal concerns and prevail over the statute.

### Facts Relevant to the Status and Relationship
### Between the Parties Preceding the Present Controversy

15. Captain Chad Miller has been employed by the Tulsa Fire Department a little over eleven years, since 2000. In 2007, he was elected as 3rd District Vice President of IAFF Local 176. In 2009, he was elected as Secretary/Treasurer. He also holds positions as a district vice-president and executive vice president with the Oklahoma association of the IAFF.

16. Captain Miller testified, and this court finds, that Captain Miller and other fire fighter members of IAFF Local 176, have taken active parts in political campaigns for the election of officers of the City of Tulsa since Miller was first employed with the City in 2000. Those political activities include:

a. Mailing questionnaires developed by the union to each of the candidates who have filed for city offices. The questionnaire asks if the candidate seeks the endorsement and support of IAFF Local 176; whether the candidate has a campaign manager; whether the candidate has a campaign fund and, if so, what is the balance of that fund; whether the candidate would support the fire fighters' endeavor to take over transport services for medical emergencies for the city from the current provider (the Emergency Medical Services Authority); and whether the candidate

would support the fire fighters on other issues. Candidates are informed that, if they would like the fire fighters' endorsement and support, the candidate should return the questionnaire.

b.   Meeting with and interviewing candidates for city offices.  During the interviews, the fire fighters "explain to [the candidates] that we support people that support us."  Captain Miller testified, and the Court finds, that the fire fighter members of the union do not ask for anything specific, but ask to have an open door, and that the candidate would listen to the fire fighters' issues and take them into consideration when making his or her decisions.

c.   Endorsing candidates for city offices, which includes the offer of an endorsement letter and the services of fire fighters in political campaigns;

d.   Preparing and paying for yard signs indicating the endorsement of candidates by IAFF Local 176 (*See, e.g.,* Plaintiffs' Exhibit 1, "Tulsa Fire Fighters for David Patrick," used in the 2009 City Council election);

e.   Placing political yard signs at addresses where individuals have requested them;

f.   Walking door-to-door in T-shirts containing the words "Tulsa Fire Fighters" together with the IAFF Local 176 insignia, and either hanging door flyers or knocking on doors and contacting residents in those areas a candidate has targeted;

g.   Running phone banks on behalf of candidates;

h.  Distributing campaign literature prepared by the union on behalf of the candidate (*See, e.g.,* Plaintiffs' Exhibit 3, "Tulsa Fire Fighters for Bart Rhoades, City Council," used in the 2009 City Council election);

i.  Preparing and mailing campaign literature to areas targeted either by the union or the candidate (*See, e.g.,* Plaintiffs' Exhibit 2, "Tulsa Fire Fighters for Christiansen," used in the 2009 City Council election, which included the statements "Bill Christiansen is committed to supporting Tulsa's Firefighters" and "Bill Christiansen has the confidence of Tulsa Firefighters."); and

j.  Contributing to municipal candidates through the union's political action committee.

17.  As a candidate for Mayor in 2009, defendant Bartlett sought the endorsement of IAFF Local 176, but the union endorsed his opponent. In 2006, the local union endorsed the incumbent mayor, Bill LaFortune, for re-election. IAFF Local 176 printed t-shirts announcing LaFortune's endorsement by Tulsa Fire Fighters, placed members of the union at the Mayor's campaign rallies, went door-to-door in certain areas of town at the Mayor's request, ran a phone bank located at the union hall to make phone calls on the Mayor's behalf, and placed yard signs. In 2002, the union endorsed LaFortune in his initial bid for election as Mayor, and provided the same type of support it gave four years later.

18.  In 2009, IAFF Local 176 and its member fire fighters supported and endorsed three candidates for city council against three incumbents, Councilors Westcott, Eagleton and Martinson. In 2006, the union endorsed and supported four city counselors. Captain

Miller testified, and the court finds, that the local union endorsed candidates for city councilor in the 2002 and 2000 elections. The parties presented no admissible evidence concerning elections held prior to the year 2000.

19. Irrespective of Executive Order 2011-03, the conduct identified in paragraphs 16 through 18, above, violates the terms of Article XI, § 5.1 of the 1989 Amended Charter.

20. On February 4, 2008, Tulsa City Attorney Deirdre Dexter sent an e-mail to City of Tulsa employees summarizing the laws and rules relating to participation in local, state and/or federal elections. Consistent with the previous opinions of City Attorney McNeill, Dexter stated that the 1989 Amended Charter precluded city employees from taking "an active part in any campaign for the election of officers of the city, except to vote and privately state an opinion." [Defendants' Exhibit 12].

21. On March 4, 2008, the City Legal Department announced a different legal position. In a "CityWEB" announcement posted that day, entitled "Employees and Elections – Updated," the City Legal Department announced, in pertinent part, that "Oklahoma law allows a municipal employee to participate in partisan and non-partisan elections so long as the employee's participation occurs only during off-duty hours and the employee is not in uniform." [Plaintiffs' Exhibit 4].

22. In an email to fire department employees dated September 3, 2009, Tulsa Fire Chief Allen LaCroix stated, in pertinent part, that "[f]irefighters must follow city policy and procedures as posted on the cities [sic] intranet. It basically prohibits political involvement while on duty and or in uniform. Any political involvement must be off duty and out of official department uniform." [Plaintiff's Exhibit 5].

23.  In early September of 2009, City Attorney Dexter made statements reported in the news media that partially contravened the 1989 Amended Charter and the opinions of previous City Attorneys, namely, that city employees could campaign in city elections while off-duty in union Tulsa Fire Fighter T-shirts, but not in City of Tulsa Fire Fighter T-shirts. [Defendants' Exhibit 8]. There is no evidence before this court that City Attorney Dexter at any time issued a formal legal opinion on the issue.

24.  In a memorandum dated September 3, 2009, then-Mayor Kathy Taylor stated, in reference to Okla. Stat. tit. 11, § 22-101.1, that city employees' political activities could take place on an employee's own time and when the employee is not dressed in a city uniform.  [Plaintiffs' Exhibit 6].

25.  Based upon the evidence presented at the hearing on plaintiffs' motion for preliminary injunction, the City of Tulsa has not enforced Article XI, Section 5.1 of the 1989 Amended City Charter for at least the last eleven years.

## Executive Orders 2011-02 and 2011-03

26.  On January 14, 2011, Mayor Bartlett issued Executive Order 2011-02.  The order stated that employees "shall not take an active part . . . in any City political campaign of purely a local interest and local concern, except to vote and privately state their personal opinions."  The order stated that City Charter Article X Section 10.1 and Article XI Section 5.1 prohibit political activities by all persons in the classified service of employment with the City of Tulsa as well as all members of the Tulsa Fire Department, and prevail over any conflicting state statute to the contrary.  The order also addressed the application of the federal Hatch Act to certain city employees whose positions are funded in whole or in part by federal funds.  Interim City Attorney David

Pauling signed the Executive Order as "approved to form and legality." [Plaintiff's Exhibit 7].

27. On January 27, 2011, Fire Chief LaCroix forwarded Executive Order 2011-02 to all fire fighters. Chief LaCroix stated in his message that "[f]ailure to follow this order may lead to termination." [Plaintiff's Exhibit 7].

28. On February 8, 2011, an attorney with the U.S. Office of Special Counsel wrote Fire Department Chief LaCroix concerning allegations that fire fighters had violated the Hatch Act by campaigning in their official capacity for certain candidates prior to the September 8, 2009 municipal election. The Office of Special Counsel concluded that the evidence from its investigation did not support the allegations that fire fighters had violated the Hatch Act, and closed the file without further action. [Doc. No. 16-1, Ex. 10 to Defendant's Response in Opposition to Plaintiffs' Motion for Preliminary Injunction].

29. On April 1, 2011, Mayor Bartlett issued Executive Order 2011-03, which explicitly repealed and nullified Executive Order 2011-02. [Defendants' Exhibit 13]. Unlike the previous order, Executive Order 2011-03 contains no reference to the federal Hatch Act. It states, in pertinent part:

> 1. Employees in the classified service and no chief, officer or sworn member of the Fire Department shall not [sic] take an active part, nor shall they use their position as a City of Tulsa employee in an attempt to influence the outcomes, in any City political campaign involving the election of the offices of mayor, Auditor or City Councilor, which are matters of purely a local interest and local concern, except to vote and privately state their personal opinions;
>
> * * * *
>
> 3. City Charter Article X Section 10.1 and Article XI - Sections 5.1 restrict political activities by all persons in the

classified service of employment with the City of Tulsa as
well as all members of the Tulsa Fire Department and
prevail over any conflicting state statute to the contrary.

30. Executive Order 2011-03 defines taking an "active part" in a municipal electoral campaign as "acting as an officer of any City political campaign, publically [sic] speaking at a City political rally, actively picketing, or actively and publically [sic] soliciting votes for any particular City candidate or, otherwise, wearing any form of uniform identifiable with City employment. A City 'uniform' is a description of a manner of dress which implies or indicates to any reasonable understanding a membership or belonging to a particular City organization; It not [sic] limited to official duty uniforms of the City of Tulsa identifying City employment, and is inclusive of any form of visual identification dress intend [sic] to create a perception of City of Tulsa employment." [*Id.*].

## The Instant Action

31. On June 22, 2011, plaintiffs filed this action in state court. Defendants removed the action to this court on July 11, 2011. On July 12, 2011, the court set plaintiffs' request for Temporary Injunction for hearing on July 28, 2011 and directed the parties to file simultaneous briefs by July 26, 2011.[2] Following the hearing, the court directed counsel to file proposed findings and conclusions by August 2, 2011.

32. In their Petition and Complaint for Declaratory and Injunctive Relief, plaintiffs seek a temporary injunction "prohibiting defendants from disciplining Plaintiffs and other City employees for engaging in political activity, while off duty and while out of uniform." [Doc. 2-1, p.10]. In their Motion for a Preliminary Injunction filed July 26,

---

[2] The court has treated the request filed in state court as one for preliminary injunction pursuant to Fed.R.Civ.P. 65.

2011, plaintiffs request a preliminary injunction requiring defendants to withdraw Executive Order 2011-03 and to permit the plaintiffs, and those similarly affected, to participate in the political process. [Doc. 15, p. 15].

33.  The City has not yet brought an enforcement action based on Executive Order 2011-03.  In response to a question posed at the hearing by the court, counsel for the parties agreed that plaintiffs' challenge to Executive Order 2011-03 is a facial challenge, not an as-applied challenge.

34. The City of Tulsa's primary election is scheduled to be held on Tuesday, September 13, 2011.

35. The City of Tulsa's general election is scheduled to be held on Tuesday, November 8, 2011.

## II.  CONCLUSIONS OF LAW

### A.  Plaintiffs' Burden to Obtain a Preliminary Injunction

1.  A party seeking a preliminary injunction bears the burden of showing:  "(1) a substantial likelihood of prevailing on the merits; (2) irreparable harm unless the injunction is issued; (3) [that] the threatened injury to the movant outweighs the harm that the preliminary injunction may cause the opposing party; and (4) [that] the injunction, if issued, will not adversely affect the public interest."  *Greater Yellowstone Coalition v. Flowers,* 321 F.3d 1250, 1255 (10th Cir. 2003), *quoting Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999).

2.  If the Plaintiffs can establish that the latter three requirements tip strongly in their favor, the test is modified, and the plaintiffs may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious,

substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation. *Greater Yellowstone Coalition,* 321 F.3d at 1255, *quoting Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). As discussed below, the Court concludes that the latter three requirements do not tip strongly in plaintiffs' favor, and therefore the test ought not be modified in this case.

3. "Because 'a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal.'" *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001) (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991) (citation omitted); *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Social & Rehab. Servs.*, 31 F.3d 1536, 1543 (10th Cir. 1994).

4. For some requested preliminary injunctions, a movant has an even heavier burden of showing that the four factors listed in paragraph 1, above, weigh heavily and compellingly in movant's favor before an injunction may be issued. *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). The heightened burden applies to preliminary injunctions that (1) disturb the status quo, (2) are mandatory as opposed to prohibitory, or (3) provide the movant substantially all the relief he may recover after a full trial on the merits. *See Id.* Defendants argue that plaintiffs bear a heightened burden in this case. For the reasons set forth in the next three paragraphs, the Court concludes that plaintiffs do not bear a heightened burden.

5. The City of Tulsa contends that the preliminary injunction plaintiffs seek would alter the status quo between the parties because Tulsa's 1908 Charter and 1989 Amended Charter have forbidden city employees, including fire fighters, from actively participating in municipal political campaigns for over one hundred years. The Tenth Circuit Court of

Appeals has explained that the status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001), *citing SCFC, ILC, Inc. v. Visa, USA Inc.*, 936 F.2d 1096, 1100 n. 8 (10th Cir. 1991) (quotation omitted). In determining the status quo for preliminary injunctions, a court must look to "the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.* In *Dominion Video Satellite*, the last uncontested status of the parties was the four years in which EchoStar activated Dominion subscribers regardless of whether the subscriber had met certain qualifying criteria. The Court held that, even if EchoStar had the *legal* right under the contract to refuse activating new, non-qualified Dominion subscribers, the *reality* was that EchoStar activated Dominion subscribers whether or not they met the qualifying criteria. The same analysis is applicable here. The last uncontested status and relationship between the parties was the eleven years (at least) in which the City ignored the Charter provisions and permitted fire fighters to take an active part in city electoral campaigns. Even if the City had the legal right under the 1989 Amended Charter to prohibit such political activity, the reality is that the City has permitted fire fighters to take active parts in city electoral campaigns for years before the present controversy arose. The "last uncontested status between the parties which preceded the controversy" permitted such political activity *in reality*. Therefore, the preliminary injunction plaintiffs seek would not alter the "status quo," as defined by controlling case law, between the parties.

6. The City of Tulsa contends that plaintiffs seek a disfavored injunction because plaintiffs request a mandatory rather than a prohibitory injunction. As noted in Finding

of Fact No. 26, above, plaintiffs' Petition filed in state court calls for an injunction prohibiting defendants from disciplining plaintiffs and other City employees for engaging in political activity, while off duty and while out of uniform. In contrast, their motion filed July 26, 2011, requests a preliminary injunction "requiring defendants, and those acting in concert with them, to withdraw Executive Order 2011-03." At the hearing held on the motion, however, plaintiffs' counsel contended the plaintiffs were seeking prohibitory relief. This Court concurs. The preliminary injunction sought here is more properly characterized as prohibitory because it seeks to prevent the possible enforcement of Executive Order 2011-03 and Article XI, Section 5.1 of the Amended City Charter.

7. The City of Tulsa contends the injunction plaintiffs seek is disfavored because it would "provide the movant substantially all the relief he may recover after a full trial on the merits." *Kikumura*, 242 F.3d at 955. The Court disagrees. The Tenth Circuit has explained that "[t]he only reason to disfavor a preliminary injunction that grants substantially all the relief sought is if it would render a trial on the merits largely or completely meaningless. Therefore, 'all the relief to which a plaintiff may be entitled' must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 (10th Cir. 2001) (citation and quotations omitted). A *temporary* injunction does not afford substantially all the relief a party might recover. *Id.* at 1248. The preliminary injunction sought here would only affect political activities in connection with the upcoming 2011 city council elections. It would not provide the plaintiffs substantially all the relief it could feasibly obtain after a full trial on the merits (namely, a permanent injunction applicable to *all* future city elections).

8. The City argues that plaintiffs' request for an injunction must be denied because the issuance of Executive Order 2011-03 was discretionary, and there is no evidence the order was issued fraudulently or in bad faith. *See White v. Pottawatomie County,* 184 P.2d 446, 449 (Okla. 1947); *Robinson v. Maynard,* 857 P.2d 817, 821 (Okla. Ct. App. 1992); *compare Louisiana v. McAdoo*, 234 U.S. 627, 633-634 (1914). The facts reveal a situation in which the Mayor was confronted with the necessity of construing the applicable laws with the aid and assistance of his Interim City Attorney, and was presented with the issue of whether the City charter provisions had been superseded by state law. Thus, the situation required the exercise of judgment and discretion despite the Mayor's ministerial duties to adhere to, and enforce others' adherence with, the city charter. This Court is not convinced, however, that the discretion exercised was of the kind which imposes upon plaintiffs an additional burden (proof of fraud or bad faith) in order to obtain a prohibitory injunction. In *Louisiana v. McAdoo*, the United States Supreme Court denied the State of Louisiana leave to file an original petition against the Secretary of the Treasury to review the Secretary's official judgment as to the rate of duty to be imposed on imported Cuban sugar. In a statute originally enacted in 1792, Congress conferred discretionary duties upon the Secretary of the Treasury "to superintend the collection of customs duties as he shall think best." *Id.* at 633. The Court refused to interfere with the discretionary duties conferred by Congress, stating "courts will refuse to substitute their judgment or discretion for that of the official intrusted by law with its execution. Interference in such a case would be to interfere with the ordinary functions of government." *Id.* at 634. Such is not the case here. The Mayor was not conferred discretionary duties pertaining to ordinary functions of government. Rather,

the discretion exercised here concerns a matter of law now before the courts for review. This matter may ultimately be certified to the Oklahoma Supreme Court for its decision as a matter of law. This Court therefore declines defendants' invitation to impose upon the plaintiffs additional evidentiary burdens in order to obtain an injunction.

9. Plaintiffs concede in oral argument, and the facts establish, that Plaintiffs are challenging Executive Order 2011-03 facially, and not as-applied.

10. Plaintiffs can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the [Executive Order] would be valid." *Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 450 (2008) (citing *U.S. v. Salermo*, 481 U.S. 739, 745 (1987)).

11. "Facial challenges are disfavored for several reasons." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). "Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Id.* (quoting *Sabri v. U.S.*, 541 U.S. 600, 609 (2004)). "Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (internal quotations and citations omitted). "Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Id.* at 451 (quoting *Ayotte v. Planned Parenthood of*

*Northern New Eng.*, 546 U.S. 320, 329 (2006)) (internal quotations and further citations omitted).

## B.  Analysis

### 1.  Likelihood of Prevailing on the Merits

12. For over a century, courts have upheld the constitutionality of regulations curtailing the rights of public employees to engage in certain kinds of political speech. *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1271 (*citing U.S. Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers,* 413 U.S. 548 (1973); *United Pub. Workers v. Mitchell*, 330 U.S. 75 (1947); and *Ex Parte Curtis*, 106 U.S. 371 (1882)).  *See also Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (upholding constitutionality of Oklahoma statute preventing state classified employees from taking an active roles in political campaigns).  "When the government is acting as an employer, rather than as a sovereign, the First Amendment does not apply with full force. Although the government, acting as an employer, 'cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression,' a government employer 'may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large.'"  *Horstkoetter*, 159 F.3d at 1271 (citing *Connick v. Myers,* 461 U.S. 138, 142 (1983)), and *United States v. National Treasury Employees Union,* 513 U.S. 454, 465 (1995)).  In light of these longstanding binding precedents, the Court concludes that plaintiffs have not shown a likelihood of success on the merits of their claims that Executive Order 2011-03 is unconstitutional.

13.   The Court concludes that, to the extent the plaintiffs request a preliminary injunction requiring defendants to withdraw Executive Order 2011-03 in its entirety (as requested in plaintiffs' Motion for Preliminary Injunction), the plaintiffs have not met their burden on their facial challenge, as they have filed to establish that no set of circumstances exist under which the Executive Order would be valid.  Executive Order 2011-03 broadly encompasses actions for which the City could properly discipline a fire fighter without running afoul of the Constitution, e.g. campaigning in an official duty uniform.  Moreover, plaintiffs' facial challenge must fail because Executive Order 2011-03 has a "plainly legitimate sweep," that of regulating the political activities of municipal employees.  *Washington State Grange*, 552 U.S. at 449.

14.   As set forth in Finding of Fact No. 31, above, the plaintiffs have also requested a preliminary injunction limited to the portion of the Executive Order 2011-13 prohibiting plaintiffs from engaging in political activity, while off duty and out of uniform.  *See* Petition and Complaint for Declaratory and Injunctive Relief, Doc. No. 2-1, p. 10.  This Court is unaware of any reason why plaintiffs cannot mount a facial challenge to *a portion* of the Executive Order, and the parties have not addressed the issue.  Therefore, the Court enters the following conclusions of law relative to plaintiffs' facial challenge of the portion of the Executive Order prohibiting plaintiffs from engaging in political activity while off duty and out of official duty uniform.  The issue is one of state law, which the parties may wish to certify to the Oklahoma Supreme Court.  However, given the importance of ruling on the motion for preliminary injunction, this Court must predict how the Oklahoma Supreme Court will rule on the issue in order to determine the plaintiffs' likelihood of prevailing on the merits.

15. The City of Tulsa is a "charter municipality" under Article XVIII, § 3(a) of the Oklahoma Constitution and the implementing statutory provision, Okla. Stat. tit. 11, § 13-101. A city charter has the force of the City's fundamental law. *Trimble v. City of Moore,* 818 P.2d 889, 898 (Okla. 1991). Under Oklahoma's "home rule" doctrine, a city charter supersedes conflicting state law on matters of purely municipal concern. *Id.*; *Oliver v. City of Tulsa*, 654 P.2d 607, 609 (Okla. 1982).

16. The "home rule" doctrine is codified in Okla. Stat. tit. 11, § 13-109, which provides: "Whenever a charter is in conflict with any law relating to municipalities in force at the time of adoption and approval of the charter, the provisions of the charter shall prevail and shall operate as a repeal or suspension of the state law or laws to the extent of any conflict." "Such charter provisions, when not inconsistent with the Constitution, supersede the statutes pertaining to municipal affairs, and thereby become[ ] the superior law in matters pertaining to municipal affairs." *Lee v. Norick*, 447 P.2d 1015, 1017-1018 (Okla. 1968).

17. Okla. Stat. tit. 11, § 22-101.1 permits municipal employees to actively participate in partisan and nonpartisan political activities, provided that the political activity is exercised during off-duty hours and while not in uniform. Oklahoma Attorney General Opinion 81-90 concludes that the statute implicates a matter of statewide interest and supercedes city charter provisions with which it is in conflict. Tulsa City Attorney Opinions 84-4, 90-3, Supplement to 90-3, and 91-6 conclude the city charter provisions relate to local municipal concerns which prevail over the conflicting state statute. In analyzing the weight to be given to the Attorney General's opinion and the Tulsa City Attorney's opinions, this court notes that such opinions are persuasive authority.

*National Cowboy Hall of Fame and Western Heritage Center v. Oklahoma Human Rights Comm'n*, 579 P.2d 1276, 1279 (Okla. 1978).

18. For the reasons set forth in the following four paragraphs, this court is currently unpersuaded by the legal reasoning contained in Attorney General Opinion 81-90. However, the court presently finds persuasive the legal reasoning of Tulsa City Attorney Opinion 90-3, written by then-Assistant City Attorney Martha Rupp Carter, who later became City Attorney under Mayor Susan Savage. Therefore, the Court cannot conclude at this juncture that the plaintiffs are likely to succeed on the merits.

19. Attorney General Opinion 81-90 is premised upon the decision in *Midwest City v. Cravens,* 532 P.2d 829 (Okla. 1975). The Attorney General opinion states that *Cravens* makes it possible to predict with reasonable certainty that § 22-101.1 implicates a matter of statewide concern. *Cravens* involved the Fraternal Order of Police (the "FOP"), as the bargaining agent for the Midwest City Police Department. The FOP sought to negotiate the salary portion of an employment contract with the City of Midwest City. Midwest City refused to negotiate on the grounds that it called for a reclassification of police personnel and under Midwest City's charter, the City was solely responsible for such matters. The Court held that the collective bargaining provisions in the Fire and Police Arbitration Act does not contravene Article XVIII, § 3 of the Constitution, and that the police, through the FOP as their collective voice, were entitled to discuss with Midwest City the terms and conditions of their employment. Although *Cravens* did not identify any actual conflict between the charter provisions and the Arbitration Act, the Court stated that "the privilege of communicating with their respective employers with a collective voice involves a matter of state-wide concern and the Act authorizing them to

speak through a collective voice supersedes any charter provisions to the contrary." 532 P.2d at 834. Attorney General Opinion 81-90 states that, in reaching its result, the *Cravens* Court "recognized that the creation of uniform fair labor practices throughout the state between municipalities and their employees is a matter of statewide concern." The Attorney General Opinion concludes that § 22-101.1 "likewise establishes a uniform municipal labor practice throughout the State of Oklahoma." One of the defects in the Attorney General's analysis is set forth in the City Attorney Opinion 90-3 -- the statewide concern that fire fighters and police be accorded the privilege of communicating with a collective voice in bargaining "strikes no similar chord in the separate issue of political activity in partisan city elections." *See* Opinion No. 90-3, p. 3. The two issues are separate and distinct. While the statewide concern of granting police and fire fighters the privilege of speaking through a collective voice in bargaining cannot fairly be disputed, it is quite another to characterize political activity in municipal elections as a "uniform labor practice."

20. A second, more troubling defect in Attorney General Opinion 81-90 is that its central premise is demonstrably false. Section 22-101.1 did not establish a uniform municipal practice throughout the State of Oklahoma with respect to participation in municipal elections. To the contrary, the statute originally carved out a non-uniform policy applicable only in cities having a population equal to or less than one hundred thousand (100,000) persons, and in cities with a population in excess of one hundred thousand (100,000) persons whose charters did not restrict the political activities of certain municipal employees. The Opinion wholly ignores the sentence in the statute, then in place, that creates a non-uniform practice. Also troubling is that the Attorney

General's opinion wholly ignores Okla. Stat. tit. 11, § 11-123, which went into effect July 1, 1978 and remains in effect to this day, and which established different, tighter restrictions on employees in the classified service of statutory strong-mayor-council cities:

> § 11-123. Political activity prohibited for officers and employees in classified service – Removal for violations
>
> A.     No officer or employee in the classified service of a statutory strong-mayor-council city may actively influence, or actively attempt to influence, or work actively for, the nomination, election or defeat of any candidate for mayor or councilmember; but this shall not prohibit the ordinary exercise of one's right as a citizen to express his opinions and to vote.   An officer or employee who violates this section shall be removed from office or position either by the authority normally having power to remove him, or, after adequate opportunity for a public hearing, by the personnel board.

The pre-existence of this different, non-uniform practice applicable to statutory strong-mayor-council municipalities raises serious questions about the accuracy of the Attorney General's conclusion that § 22-101.1 "establishes a uniform municipal labor practice throughout the State of Oklahoma."   And in light of the fact that § 11-123 remains in effect, it appears that the Attorney General's conclusion remains legally inaccurate. Insofar as plaintiffs rely on the Attorney General's opinion in support of their motion for preliminary injunction, these issues raise serious doubts about plaintiffs' likelihood of prevailing on the merits.

21.  Attorney General Opinion 81-90 states that under § 22-101.1, municipalities are "forbidden to make nonparticipation in municipal partisan policies a term or condition of municipal employment."   This statement also appears to be in error, insofar as § 11-123

explicitly forbids political activity by classified employees in strong-mayor-council municipalities, and insofar as the version of § 22-101.1 then in place explicitly acknowledged that municipal charters in cities having a population in excess of one hundred thousand could legally restrict the political activities of municipal employees.

22. The Oklahoma Supreme Court has held that silence by the Legislature may be regarded as acquiescence or approval of the interpretation placed upon the provision by the Attorney General. *National Cowboy Hall of Fame and Western Heritage Center*, 579 P.2d at 1279. The parties have not fully and adequately briefed the issues as to whether the Oklahoma Legislature's subsequent actions or inaction ought to be regarded as acquiescence or approval of Attorney General Opinion 81-90. Such issues include, but are not necessarily limited to: 1) insofar as the Legislature has not repealed § 11-123, has it manifested the necessary intent to establish a uniform statewide practice with regard to political activities in municipal elections?; and 2) insofar as the Legislature revised § 22-101.1 in 1983, two years after Attorney General Opinion 81-90, ought the revision be considered an act of acquiescence to the Attorney General's opinion? At this juncture, with these unaddressed and unresolved issues, the Court cannot conclude plaintiffs are likely to prevail on the merits.

23. The charter is the organic law of a municipality. Okla. Stat. tit. 11, § 13-107. It cannot be overturned by the oral advice of a City Attorney.

24. Plaintiffs argue that the Tulsa Fire Department's mutual aid agreements with surrounding jurisdictions, its regional Hazmat Unit which provides services outside Tulsa's city limits, its Urban Search and Rescue Unit which provides services outside the city limits, and its receipt of federal funding to help prevent Fire Department layoffs and

purchase bunker gear make the subject matter of this dispute a matter of statewide interest and not a matter of purely municipal concern. This Court respectfully disagrees. The subject matter of this dispute does not concern mutual aid agreements, bunker gear, or the provision of services outside Tulsa's city limits. Rather, the subject matter more narrowly involves the issue of permissible political activity by city fire fighters and classified employees, which appears at this juncture to be a matter of purely municipal concern.

25. Citing *Clapsaddle v. Blevins*, 66 P.3d 352 (Okla. 1998) in support, Plaintiffs contend that city-wide elections are run pursuant to and governed by the State Election Board and state election laws and are therefore a matter of statewide concern. In *Clapsaddle,* the Oklahoma Supreme Court held that *the scheduling and setting* of a special municipal election, which must be conducted by the county election board under the oversight of the State Election Board, is not a matter of local concern. *Id.* at 359. State law requires the governing body of a municipality to submit a resolution to the county election board not fewer than 60 days before a special election is to be held. The Supreme Court simply held that state law supplants nonconforming city law with regard to the minimum time required to prepare adequately for an election. *Id.* Issues involving the scheduling of elections and/or the administration of the election itself are not implicated in the present case. In response to a question from the court at oral argument, plaintiffs' counsel took the position that all local elections are a matter of statewide concern. This Court is unpersuaded with that proposition of law -- that a local election can never be a matter of purely local concern.

26. This Court is mindful that "the question as to what constitutes purely municipal matters or affairs [is] a question difficult of determination, as there does not appear to be any well-established rule by which it may be determined as to just what affairs or matters are purely municipal." *City of Sapulpa v. Land*, 223 P. 640, 642 (Okla. 1924). However, based on the briefs and arguments thus far submitted, the Court concludes that plaintiffs have not met their burden of showing a likelihood of prevailing on the merits on Claim One

27. In Claim Two, the plaintiffs claim that Executive Order 2011-03 purports to establish a new departmental practice, rule, regulation, or manner of conducting the operation and administration of the Tulsa Fire Department. [Petition and Complaint, Doc. No. 2-1, ¶ 27]. Plaintiffs contend that "[t]he purported change in City policy, practice, rule, regulation, manner of conducting of the operation and administration of the Tulsa Fire Department, and working conditions of the fire fighters of the City of Tulsa took place without legally required negotiations between the City of Tulsa and the Tulsa Fire Fighters Association." [Id. ¶ 31]. Executive Order 2011-03 does not constitute a change insofar as a city charter provision explicitly restricting political activities by fire fighters has been in place in Tulsa for over 102 years. Assuming, arguendo, that the charter prohibition on fire fighters' political activities is a matter of purely local concern, the city is not estopped from enforcing that portion of its organic law due to its failure to enforce for at least 12 years. The charter provision is not an employment condition to be collectively bargained. The Court concludes that plaintiffs have not met their burden of showing a likelihood of prevailing on the merits on Claim Two.

28. In Claim Three, the plaintiffs contend that Executive Order 2011-03 is in violation of 13 Tulsa Rev. Ord. § 106 because (a) it is in conflict with the laws of the state of Oklahoma; and (b) it was not approved by the City Council before it was deemed effective. [*Id.*, ¶¶ 39-40]. The Court has previously addressed the issues of alleged conflict with state law and will not re-address them here. Upon review of the proposed findings and conclusions, the Court concludes that Executive Order 2011-03 merely reflects the longstanding content of the prohibition on political activity contained in the Tulsa City Charter and does not therefore constitute a new departmental practice, rule, regulation or manner of conducting the operation and administration of the Tulsa Fire Department. The Court therefore concludes that plaintiffs have not met their burden of showing a likelihood of prevailing on the merits on Claim Three.

## 2. **Irreparable Harm**

29. As discussed above, "the reality of the existing status and relationship between the parties," as contrasted with the parties' legal rights here in controversy, is that fire fighters have been permitted to take an active part in city electoral campaigns for at least the last eleven years. If plaintiffs are not permitted to actively participate in the upcoming 2011 city elections, and if they ultimately prevail on the merits of their argument that 11 O.S. 1981, §22-101.1 supersedes Article XI, § 5.1 of the 1989 Amended Charter, they will have suffered the irreparable deprivation of their rights to actively participate in the upcoming elections.

30. However, the Plaintiffs do not seek to enjoin enforcement of Article XI, § 5.1 of the 1989 Amended Charter. Rather, they only seek to enjoin enforcement of all or part of Executive Order 2011-03. As such, the issuance of an injunction against Executive Order

2011-03 alone would not protect the Plaintiffs from the alleged harms resulting from enforcement of Article XI, § 5.1 of the 1989 Amended Charter. Therefore, an order denying the plaintiffs' request for preliminary injunction will not prevent alleged irreparable harm, should the City decide to enforce the provisions of the Amended Charter.

### 3. <u>Balance of Harms</u>

31. Government employers have certain legitimate interests in regulating the conduct and the speech of its employees. Public employees "are expected to enforce the law and execute the programs of [government] without bias or favoritism for or against any political party or group or the members thereof." *U.S. Civ. Svc. Comm'n. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 564 (1973). "A major thesis of [laws regulating public employee speech and conduct] is that to serve the great end of [g]overnment -- the impartial execution of the laws – it is essential that [public] employees [ ] not take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns, and not run for office on partisan political tickets." *Id.* The City of Tulsa has a legitimate interest in (a) avoiding the *appearance* of "practicing political justice," and the resultant erosion of public confidence; (b) preventing "the rapidly expanding [g]overnment work force," paid for at public expense, from becoming "a powerful, invincible, and perhaps corrupt political machine" lobbying for increasing percentages of city revenues; (c) "serv[ing] the goal that employment and advance in the [g]overnment service not depend on political performance;" and (d) "mak[ing] sure that [g]overnment employees [are] free from pressure and from express or tacit invitation to vote in a certain way or perform political

chores in order to curry favor with their superiors rather than to act out their own beliefs." *Id.* at 564-65. Moreover, the City of Tulsa has a legitimate interest in permitting its policymakers to make decisions for the city without fear of political retribution from the city's own employees and their public employees' unions.

32. Plaintiffs contend they participate in political activities to offer their unique perspective no others can bring to the table on issues of public safety. Thus, they claim an interest in discussing with members of the public the candidates' positions on issues concerning public safety and fire and police protection. Without question, IAFF Local 176 and its members can bring a unique, well-informed perspective to the table with regard to issues of public safety. However, they have not met their burden in showing that their interest must be satisfied by actively participating in the municipal electoral process as opposed to offering that unique perspective to public policymakers within the channels of municipal governance.

33. A governmental entity's interests in reasonably curtailing the political activities of its employees, in certain circumstances, outweigh the public employees' interests in free speech. *See, e.g., Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1271-72 (10th Cir. 1998) (upholding the facial constitutionality of an Oklahoma Highway Patrol policy which forbade troopers from displaying political signs at their private residences);[3] and *Broadrick v. Oklahoma*, 413 U.S. 601 (1973) (holding that Oklahoma statute regulating political activity by state employees was not substantially overbroad and was not

---

[3] In contrast to this case, *Horstkoetter* involved an "as applied" challenge to the Oklahoma Department of Public Safety's enforcement of a policy prohibiting troopers from displaying political signs in their yards. The Circuit applied the *Pickering/Connick* balancing test to determine whether the public employer had infringed on the troopers' freedom of expression. The court concluded that while the policy was facially constitutional, as applied to situations in which a trooper has no interest, or merely a joint or common interest, in his residential property, the policy cannot extend far enough to allow a trooper to be disciplined for not removing a sign from his residential property placed there by one who possesses a common interest in the property, so long as the sign is solely the speech of the common interest holder. 159 F.2d at 175-76.

unconstitutional on its face).

**4.  Effect on the Public Interest**

34. Upon consideration of the briefs and arguments of counsel, as well as the interests set forth in paragraph 26, above, the Court concludes that plaintiffs have not met their burden of showing that failure to enter the requested injunction would be adverse to the public interest.  As the Supreme Court has stated:  "[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent."  *Id.* at 565.

For the reasons set forth above, the Court concludes that plaintiffs have failed to establish a "clear and unequivocal" right to the requested preliminary injunction. Therefore, plaintiffs' Motion for Preliminary Injunction [Doc. No. 15] must be denied.

IT IS SO ORDERED this 12th day of August, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma